MHN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NANCY RAVESLOOT,             )
                                    )
        Plaintiff,            )
                                    )
     v.                     )
                                    )    Case No. 07 C 3019
ADMINISTRATIVE COMMITTEE of the  )
Employee Benefits Management Department )    Judge John W. Darrah
for Baxter International, Inc., in its   )
capacity as Plan Administrator of the ERISA )
Plan for Baxter International, Inc.;    )
THE HARTFORD LIFE AND ACCIDENT )
INSURANCE COMPANY,         )
                                    )
        Defendants.        )

### MEMORANDUM OPINION AND ORDER

Plaintiff, Nancy Ravesloot, filed suit against Defendants, the Administrative Committee of the Employee Benefits Management Department for Baxter International, Inc. ("Administrative Committee") and Hartford Life and Accident Insurance Co, Inc. ("Hartford"), the claims administrator, following the termination of her long-term disability benefits. Presently pending before the Court are cross-motions for summary judgment.

### FACTS

Ravesloot was hired by Baxter International, Inc. ("Baxter") on August 9, 1999, as a Customer Service Specialist. (Plaint.'s 56.1(a)(3) Statement ¶ 2; Def.'s 56.1(a)(3) Statement ¶ 14). As a Customer Service Specialist, Ravesloot wore a telephone headset for her entire shift, which was four ten-hour days per week. (Def.'s 56.1(a)(3) Statement ¶ 16). Ravesloot sat at a computer and completed in-process returns, an on-line form. The keyboard usage was mostly tabbing and scrolling to a specific location and then typing data. (Id., ¶ 17).

Ravesloot was a participant in an Employment Retirement Income Security Act ("ERISA")
plan ("Plan") – governed employee welfare benefit plan established by Baxter, through Baxter's
purchase of group insurance effective April 1, 1998, and issued by Continental Casualty Company,
k/n/a Hartford Life and Accident Insurance Company. (Def.'s 56.1(a)(3) Statement 6). The
Administrative Committee is the named Plan Administrator set forth in the Baxter Summary Plan
Description for Disability Benefits. (Id., ¶ 2).

Under the Plan, long-term disability benefits are payable to eligible participants in
accordance with the Plan's terms, conditions, limitations and exclusions. (Def.'s 56.1(a)(3)
Statement ¶ 7). The Plan provides, in pertinent part, that "Disability or Disabled means that You
satisfy the Occupational Qualifier . . . ." (Id., ¶ 8). An "Occupational Qualifier" is defined in the
Plan as:

> 'Disability' means that Injury or Sickness causes physical or mental
> impairment to such a degree of severity that You are:
> 1. continuously unable to perform the Material and Substantial
> Duties of Your Regular Occupation; and
> 2. not working for wages in any occupation for which You are or
> become qualified by education, training or experience.
> After the Monthly benefit has been payable for 12 months,
> 'Disability' means that, Injury or Sickness causes physical or mental
> impairment to such a degree of severity that You are:
> 1. continuously unable to engage in any occupation for which You are
> or become qualified by education, training or experience; and
> 2. not working for wages in any occupation for which You are or
> become qualified by education, training or experience.

(Id., ¶ 10).

The Plan requires, as part of proof of a disability, "[o]bjective medical findings which
support Your Disability." (Def.'s 56.1(a)(3) Statement ¶ 11). The Plan provides that "[o]bjective
medical findings include but are not limited to tests, procedures, or clinical examinations standardly

accepted in the practice of medicine, for Your disabling condition(s)." (Id., ¶ 12). The Plan includes that "You may be asked to submit proof that You continue to be disabled and are continuing to receive Appropriate and Regular Care of a Doctor." (Id., ¶ 13).

After injuring herself when she nearly fell in a store, Ravesloot was found disabled and eligible to receive short-term disability benefits for the period from September 17, 2001 through March 20, 2002. (Def.'s 56.1(a)(3) Statement ¶ 18; Plaint.'s 56.1(a)(3) Statement ¶ 6). An EMG from December 2001, from Dr. Dixon, an electromyographer, established bilateral moderate distal median depression neuropathies (carpal tunnel syndrome). (Plaint.'s 56.1(a)(3) Statement ¶ 53). On May 20, 2002, CNA, then the claims administrator of the Plan, approved Ravesloot's claim for long-term disability benefits. (Id., ¶ 7). On January 31, 2003, CNA issued a decision, finding Ravesloot ineligible for "any occupation" long-term disability benefits. (Id., ¶ 8). Following the denial of benefits, Ravesloot filed a civil action pursuant to ERISA. In June 2004, Ravesloot's motion for summary judgment in that civil case was granted; and her claim was remanded to the Plan Administrator. (Id., ¶ 9). Following the remand, Hartford reconsidered Ravesloot's eligibility for long-term disability benefits. On September 4, 2004, Hartford issued a decision, reinstating Ravesloot's disability benefits, and paid retroactive payments for the period from April 1, 2003 through September 10, 2004. (Id., ¶ 11). The decision stated, "Benefits will continue until she is no longer Disabled, she dies or reaches age 65, whichever occurs first." (Id., ¶ 13). The retroactive payments included a deduction of approximately $900 per month in long-term disability benefits because Ravesloot was receiving Social Security disability benefits. (Id., ¶ 12). The Social Security Administrative Law Judge's decision is included in Ravesloot's Hartford file. (Def.'s 56.1(b)(3) Statement ¶ 39; Plaint.'s Resp. ¶ 39).

3

Dr. Scott Reiser, Ravesloot's treating physician, included in his December 2004 records that no "real improvement" regarding Ravesloot's headaches and sore neck had been made. (Plaint.'s 56.1(a)(3) Statement ¶ 55). An MRI, from October 25, 2004, was interpreted as establishing a small paracentral disc protrusion and mild disc bulge at C5-C6, a tiny paracentral disc protrusion at T2-T3, and left facet arthropathy with some effacement of the left foraminal signal at C2-C3. A May 23, 2006 MRI also showed tiny central disc herniation at C5-C6. (Id., ¶ 58).

January 19, 2005 treatment records from the Round Beach Medical Center note Ravesloot's complaints of stiffness in her left shoulder, problems with her right hand in the early a.m. and p.m., numbness and tingling in her hands, and headaches for one year. The assessment included cervicocranial syndrome, headache, and chronic myofascial pain syndrome. (Plaint,'s 56.1(a)(3) Statement ¶ 41; Def.'s Resp. ¶ 41). Medical records from Round Beach Medical Center for July 7, 2004 through September 8, 2005, include the assessment of myofascial pain syndrome, carpal tunnel syndrome, and symptoms including numbness and tingling in the hands and neck pain. (Id., ¶ 42).

On June 14, 2005, Hartford initiated a review to update Ravesloot's claim for long-term disability benefits, noting that her file contained medical information and restrictions in effect in 2002 but did not have any current statements of treatment or functionality. (Def.'s 56.1(a)(3) Statement ¶ 20). In a questionnaire Ravesloot signed on July 3, 2005, she described her most current medical condition, which she stated had not changed in the past eighteen months, as "carpal tunnel/nerve damage in arms, hands, bulging disks in neck, chronic pain and numbness . . . unable to use hands, sit or stand for lengths of time." (Def.'s 56.1(a)(3) Statement ¶ 21). In a September 12, 2005 telephone interview with Hartford, Ravesloot stated that she felt her condition

4

was worsening, that pain radiated up and down both arms, and that she had difficulty grasping and carrying items due to weak wrists. (Id., ¶ 22). Ravesloot also stated that when she has a "flare-up," she is unable to turn her neck or look down and that when her neck locks-up, she experiences severe headaches. (Plaint.'s 56.1(a)(3) Statement ¶ 54; Def.'s Resp. ¶ 54).

Dr. Reiser's treatment notes, from September 20, 2005, indicate that Ravesloot's neck pain had worsened since her last visit and that her daily activities were seriously affected by her symptoms. Ravesloot's mid-back and low-back pain had worsened slightly. Ravesloot reported that her neck "locks up" when she turns her head. Dr. Rieser's objective evaluation revealed anomalies including cervical, thoracic and lumbar spine muscle tension bilaterally; positive Kemp's Test, Jackson Compression Test, Double Leg Raise Test, and Patrick's Test; and palpations of Ravesloot's cervical, thoracic and lumbar muscles revealed severe pain. (Plaint.'s 56.1(a)(3) Statement ¶ 43).

In October and November 2005, Hartford received Ravesloot's medical records that it did not previously possess. (Def.'s 56.1(a)(3) Statement ¶ 23). On December 6, 2005, during another telephone interview with Hartford, Ravesloot stated that her medical condition had not changed and that she continued to experience pain and weakness in her upper arms and numbness and tingling in her right hand. She stated she was right-handed and had problems grasping and holding onto objects and that she needed to find a new primary care physician. (Id., ¶¶ 24-25; Plaint.'s 56.1(a)(3) Statement ¶ 57).

5

Hartford noted that Ravesloot's restrictions and limitations were unclear and wrote to Dr. Reiser, Ravesloot's treating physician since January 2005, for clarification of Ravesloot's condition. (Def.'s 561.1(a)(3) Statement ¶ 26). Hartford informed Dr. Reiser that it defines "sedentary work" as:

> requir[ing] exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve standing or walking for brief periods of time. Jobs are sedentary if walking or standing are required occasionally and all other sedentary criteria are met.

(Id., ¶ 27).

In response to Hartford's inquiry, Dr. Reiser answered "Yes" to the question "Does Ms. Ravesloot have the physical functional ability to perform sedentary work on a full-time basis?" Dr. Reiser had last treated Ravesloot on December 7, 2005. (Def.'s 56.1(a)(3) Statement ¶ 28). On a Physical Capacities Evaluation, dated December 23, 2005, Dr. Reiser reported that in a general workplace environment, Ravesloot was able to sit for 30 minutes at a time and for 5 to 7 hours per day, stand for 5 minutes at a time and for 2 hours per day, and walk 5 minutes at a time and for 2 hours a day. (Id., ¶ 29). Dr. Reiser reported that Ravesloot could occasionally (1 to 33 percent of the time) lift, carry, push and pull up to 10 pounds. (Id., ¶ 30). Dr. Reiser further reported that Ravesloot could drive, bend at the waist, kneel and crouch occasionally and could reach at and below waist level occasionally. (Id., ¶ 31). Ravesloot could also perform the following activities occasionally: gripping, holding, grasping, fingering, and feeling (sensing temperatures and textures). (Id., ¶ 32).

6

In its February Assessment of Employability, Hartford reviewed "occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles . . . to identify occupations that would match [Ravesloot's] education, training, work history, and functionality" in Ravesloot's geographical location of approximately forty miles from Chicago, Illinois, and Milwaukee, Wisconsin. (Def.'s 56.1(a)(3) Statement ¶ 33). The Assessment of Employability researched "alternative occupations [in the] U.S. Department of Labor Bureau of Labor Statistics Metropolitan Area Occupational Employment and Wage Estimates to confirm wage and prevalence of occupations in [Ravesloot's] geographical location." (Id., ¶ 34). The Assessment of Employability noted that Ravesloot had a high school diploma and a cosmetology certificate and that she had completed a few computer classes. (Id., ¶ 35). Ravesloot's Assessment of Employability noted that she was employed from 1999 to 2001 as a Customer Service Specialist and "was responsible for filing process returns via computer" and that she previously worked as a hairstylist and secretary. (Id., ¶ 36).

The Assessment of Employability described Ravesloot's "Functional Ability" as:

> According to the claimant's treating physician, Dr. Reiser (12/23/05), claimant is capable of performing full time sedentary work.
> Dr. Reiser further provides the following restrictions: sitting 30 minutes at a time for a total of 5-7 [hours] per day; standing and . . . walking 5 minutes at a time for a total of 2 hours per day; occasional lifting of 10 pounds; occasional driving, stooping, kneeling, crouching, reaching at desk level and below waist level, handling[,] fingering and feeling.

(Def.'s 56.1(a)(3) Statement ¶ 37). The Assessment of Employability noted that "Based upon

claimant's work history, she has demonstrated she has the ability [to] . . . [p]erform a variety of duties, [d]eal with people, [m]ake judgments and decisions, and [a]ttain precise set limits, standards or tolerances." (Id., ¶ 38).

When reviewing Ravesloot's claim, Hartford considered the Occupational Description and Requirements for three occupations: information clerk, customer complaint clerk, and surveillance system monitor. Each of these occupations was in the sedentary category, involving lifting, carrying, pushing, and pulling 10 pounds occasionally and "mostly sitting, may involve standing or walking for brief periods of time." (Def.'s 56.1(a)(3) Statement ¶ 39). The occupation of surveillance system monitor does not involve reasoning, mathematics or language skills beyond Grade 8 and requires frequent talking and hearing. (Id., ¶ 40; Plaint.'s Response ¶ 40). The occupation of information clerk does not involve reasoning, mathematics or language skills beyond Grade 12 and requires occasional reaching and handling and frequent talking and hearing. (Def.'s 56.1(a)(3) Statement ¶ 41). The occupation of customer complaint clerk does not involve reasoning, mathematics or language skills beyond Grade 12 and requires occasional reaching, handling, and fingering. (Id., ¶ 42).

The Assessment of Employability noted that the occupations of information clerk, customer complaint clerk and surveillance system monitor were in a "self-paced environment as such it would allow the claimant to change positions as needed. All occupations are prevalent in the geographical area at [a] gainful wage." (Def.'s 56.1(a)(3) Statement ¶ 43). It concluded that "[b]ased upon claimant's age, work history, education, geographical location, functionality and pre-disability salary, claimant is able to perform" several alternative occupations, including surveillance system monitor, information clerk and customer service clerk. (Id., ¶ 44). After reviewing Ravesloot's entire claim

8

file, including the Assessment of Employability, Hartford concluded that Ravesloot did not continue to meet the Plan's definition of being disabled and terminated Ravesloot's long-term disability benefits as of March 6, 2006. (Id., ¶ 45).

On March 8, 2006, Hartford sent a letter to Ravesloot, informing her that her long-term disability benefits were being terminated because the evidence in her record showed that she did not meet the definition of "disabled" beyond March 6, 2006. (Plaint.'s 56.1(a)(3) Statement ¶ 19). The letter summarized some of the medical evidence of record, including that Dr. Reiser, treating physician, opined that Ravesloot could perform sedentary work and that she had the ability to: sit for 30 minutes at a time for a total of 5-7 hours a day; stand and walk for 5 minutes at a time for a total of 2 hours each day; occasionally lift/carry and push/pull up to 10 pounds; occasionally drive, stoop, kneel, and crouch; occasionally reach at waist/desk level and below waist level; and occasionally handle, finger, and feel with both hands. (Id., ¶ 21). The letter stated that "according to the medical documentation provided by the only physician you are treating with, you do not have any physical restrictions or limitations that would prevent a return to full time work." (Id., ¶ 22). The letter also informed Ravesloot that she had the right to file an appeal of the decision and that if she had any additional medical information not mentioned in the letter or if she wanted Hartford to reconsider its decision, she could submit a formal request for reconsideration in writing. (Id., ¶ 24).

In July 2006, Ravesloot's counsel informed Hartford that Ravesloot had written a letter to Dr. Reiser asking Dr. Reiser to clarify the percentage of time during an eight-hour work day that Ravesloot could have performed grasping, gripping, holding objects, and fingering. (Def.'s 56.1(a)(3) Statement ¶ 49). Dr. Reiser responded that Ravesloot could have performed these activities 16 percent of the time, or approximately ten minutes every hour. (Id., ¶ 50).

9

Ravesloot's counsel also provided Hartford medical records from Dr. Kanu Panchal, who examined Ravesloot between May 2006 and July 2006. Prior to these consultations, Dr. Panchal had not treated Ravesloot since March 2004. (Def.'s 56.1(a)(3) Statement ¶ 51). Dr. Panchal's treatment notes from, June 19, 2006, stated that Ravesloot still complained of tingling and numbness of both hands, the most recent EMG showed moderate bilateral carpal tunnel syndrome, and the MRI of the cervical spine showed a bulging disk in the neck. (Plaint.'s 56.1(a)(3) Statement ¶ 50). Treatment notes from a July 20, 2006 examination by Dr. Panchal noted that Ravesloot complained of neck pain and pain radiating down her left arm and that the neurological examination revealed Ravesloot's neck movement was somewhat restricted and painful. Ravesloot's upper extremities showed that both handgrips were weak, and Ravesloot had a positive Tinel sign at both wrists. Ravesloot's triceps reflex on the left arm was somewhat decreased. Ravesloot's diagnostic impression was for cervical radiculopathy due to cervical spondylosis C5-C6 and C6-C7, a bulging disk, and bilateral carpal tunnel syndrome. (Id., ¶ 49).

Dr. Panchal's May 15, 2006 treatment notes indicate that he had not seen Ravesloot since March 2004 and that Ravesloot stated she remained symptomatic despite treatment, with pain radiating all the way up to the elbow and in the neck. Dr. Panchal's neurological examination revealed that Ravesloot's neck movement was restricted and painful, both handgrips were weak, a strongly positive Tinel sign at both elbows and wrists, and reflexes were 1+ in both arms, knees and legs. Dr. Panchal diagnosed bilateral carpal tunnel syndrome, possible ulnar neuropathy at the elbow, and cervical radiculopathy. (Plaint.'s 56.1(a)(3) Statement ¶ 52).

10

Ravesloot's counsel also submitted a July 2006 letter he had written to Dr. Reiser, asking Dr. Reiser to pinpoint the percentages in the "occasional" range (1 to 33 percent) that Dr. Reiser identified in the December 23, 2005 Functional Capacities Evaluation. (Def.'s 56.1(a)(3) Statement ¶ 52). Dr. Reiser responded that Ravesloot's maximum lifting capacity was less than ten pounds, and her "lifting/carrying/pushing/pulling capability" was five pounds. (Id., ¶ 53). Dr. Reiser clarified Ravesloot's percentage of time for lifting/carrying/pushing/pulling, stooping, kneeling, and crouching as 4 percent. (Id., ¶ 54). Dr. Reiser indicated that Ravesloot could reach at and below the waist 3 percent of the time. (Id., ¶ 55). Lastly, Dr. Reiser wrote that there could be hours in a work day in which Ravesloot would be unable to use her hands for even ten minutes at a time and that such inability could occur at unpredictable times. (Id., ¶ 56).

On May 23, 2006, an EMG read by Dr. A. Dave, a board-certified neurologist, established bilateral median neuropathy at the wrist consistent with carpal tunnel syndrome, without findings of cervical radiculopathy. (Plaint.'s 56.1(a)(3) Statement ¶ 51).

As part of the review of Ravesloot's appeal, in November 2006, Hartford wrote to Dr. Panchal, requesting his cooperation in speaking with Hartford's consulting physician, Dr. Suresh Mahawar, who would be calling Dr. Panchal. (Def.'s 56.1(a)(3) Statement ¶ 57). Hartford noted that Dr. Panchal's cooperation would help ensure a full and fair review of Ravesloot's claim and that if the consulting physician "is unable to speak to you we will have no choice except to base our decision on documentation currently contained in our file." (Id., ¶ 58). Dr. Panchal did not return Dr. Mahawar's three telephone messages. (Id., ¶ 59).

11

Dr. Mahawar reviewed Ravesloot's file and spoke with Dr. Reiser on November 29, 2006. (Def.'s 56.1(a)(3) Statement ¶ 60). Dr. Mahawar summarized his telephone conversation with Dr. Reiser; and in a December 8, 2006 letter, requested that Dr. Reiser make any necessary corrections and sign the letter. Dr. Reiser confirmed that, in his opinion, Ravesloot could "lift up to 10 lbs. most of the time and could lift up to 20 lbs. when she is asymptomatic." (Id., ¶ 61). Dr. Reiser noted on the letter he sent back to Dr. Mahawar to "see MRI reports + neurologist reports . . . MRI findings" as to Dr. Mahawar's comments that Dr. Reiser "never found the evidence of significant neurological deficit, muscle atrophy, and joint ankylosis" and as to Dr. Mahawar's statement that Ravesloot "does not have objective clinical evidence to support" Ravesloot's lifting restrictions. (Plaint.'s 56.1(a)(3) Statement ¶ 29; Def.'s Resp. ¶ 29).

In his December 8, 2006 medical Record Review, Dr. Mahawar noted that Dr. Reiser treated Ravesloot from September 10, 2001 through December 23, 2005, for "neck, mid back, low back, right hip, left shoulder pain and headaches" and "documented multiple positive soft findings in his clinical examination." (Def.'s 56.1(a)(3) Statement ¶ 62). Dr. Mahawar summarized Dr. Panchal's 2006 exam of Ravesloot as establishing painful and reduced range of motion in the hands/wrists, weak grips, pain, and restricted neck movements. (Plaint.'s 56.1(a)(3) Statement ¶ 64).
Dr. Mahawar noted that Dr. Panchal diagnosed Ravesloot "with CTS and possible ulnar neuropathy of the elbow and cervical radiculopathy," but Dr. Mahawar concluded that "the MRI of [the] cervical spine did not show significant disk problem and her EMG with Nerve Conduction Studies on May 23, 2006 showed borderline carpal tunnel syndrome on the right side and no cervical radiculopathy or ulnar nerve neuropathy." (Def.'s 56.1(a)(3) Statement ¶ 63). Dr. Mahawar summarized Dr. Kohrs examinations of Ravesloot from 2004 through January 2005, noting that the exams showed pain,

spasm, carpal tunnel syndrome, radiculopathy, myofascial pain syndrome, neck stiffness, and decreased range of motion. (Plaint.'s 56.3(a)(3) Statement ¶ 63). Dr. Mahawar concluded that Ravesloot "should be able to work in a sedentary occupation primarily in sitting position with lifting 10 pounds occasionally and occasional standing/walking. . . . Her treating physician has recommended that she work in [a] sedentary occupation primarily in sitting position with lifting up to 10 pounds occasionally and occasional standing/walking. Therefore, she should be able to work in a sedentary occupation." (Def.'s 56.1(a)(3) Statement ¶ 64). In a section titled "Concerns," Dr. Mahawar noted that he did not find Dr. Reiser's statement from September 11, 2006; however, during his conversation with Dr. Reiser on November 29, 2006, Dr. Reiser opined that Ravesloot could work in a sedentary occupation but not in a light occupation. (Plaint.'s 56.1(a)(3) Statement ¶ 67; HA 141).

Dr. Mahawar's summary of his conversation with Dr. Reiser does not indicate that Dr. Mahawar discussed Dr. Reiser's follow-up letters to Hartford that clarified his restrictions and limitations with Dr. Reiser. (Plaint.'s 56.1(b)(3) Statement ¶ 1). Dr. Mahawar's summary of the evidence does not mention or discuss the follow-up letters sent to Hartford by Dr. Reiser that included the clarified restrictions and limitations. (Id., ¶ 3).

In a January 8, 2007 decision, upholding the termination of benefits, Hartford informed Ravesloot that she did not satisfy the definition of "disability." In this decision, a Hartford Appeals Specialist, who was not the individual who made the March 2006 termination decision, summarized Dr. Mahawar's report, in which Dr. Mahawar documented the review of Ravesloot's medical records on file and his correspondence with Dr. Reiser. (Def.'s 56.1(a)(3) Statement ¶ 65). The decision noted that in 2001, Dr. Dixon found tenderness in multiple areas with positive Tinel sign and

13

diagnosed cervical strain – stating that the EMG established a moderate degree of carpal tunnel syndrome. However, Dr. Mahawar found that the EMG showed minimal CTS and that Dr. Dixon's diagnosis of right C6-C7 and left C5-C6 radiculopathy were based on "soft findings." (Plaint.'s 56.1(a)(3) Statement ¶ 32). The decision further noted Dr. Mahawar's assessment that the treating neurologist, Dr. Burnstine, found Ravesloot's March 7, 2002 neurological examination normal; and EMG studies did not demonstrate severe neuropathy, which Dr. Mahawar found inconsistent with Dr. Burnstine's opinion that Ravesloot was not capable of keyboarding and required sitting and standing as needed. (Id., ¶ 33). The Appeal Specialist noted that the "Assessment of Employability identified several sedentary-level occupations, which based upon Ms. Ravesloot's age, work-history, education, geographical location, functionality and pre-disability salary, she would be able to perform." (Id., ¶ 66). The Appeal Specialist explained that these occupations are noted to be in a self-paced environment and would allow Ravesloot to change position as needed. (Id., ¶ 67). The Appeals Specialist concluded that based "on a review of the evidence contained in Nancy Ravesloot's claim file, including the opinion provided by Dr. Mahawar following his discussions with Dr. Reiser, Ms. Ravesloot is functionally capable of performing sedentary-level work that does not require keyboarding for more than one hour without a 15-minute break on a full-time basis." (Plaint.'s 56.1(a)(3) Statement ¶ 35).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the

evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts or by merely resting on its pleadings. *See Hemsworth, II v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (*Hemsworth*); *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Review of a motion for summary judgment on a claim for wrongful denial of benefits under ERISA begins with determining the appropriate standard of review. *See Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 538 (7th Cir. 2000). As in the present case, a denial of benefits under an ERISA plan is subject to *de novo* review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Therefore, applying a *de novo* standard, the issue is whether the Administrative Committee and Hartford were correct in their decision to deny Ravesloot any further disability benefits. *Wilczynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 933, 935 (7th Cir. 1999). When, as in this case, "cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue at trial; we then require that party to . . . establish a genuine issue of material fact." *Santaella v. MetLife Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (*Santaella*). At trial, Ravesloot would bear the burden of establishing entitlement to long-term disability benefits; and Defendants would bear the burden of proving a lack of entitlement to those benefits. *See Skibbe v. Metlife Ins. Co.*, 2007 WL 2874035 at *9 (N.D. Ill. 2007).

15

Under the Plan, Ravesloot is entitled to long-term disability benefits so long as she meets the definition of "disabled" or having a "disability" and is able to support such a contention with "objective medical findings." The objective medical findings of Ravesloot's treating physician, Dr. Reiser, indicate that Ravesloot is able to perform "sedentary work" and, therefore, does not meet the definition of having a "disability" under the Plan. Dr. Reiser's opinion was further supported by Dr. Mahawar's opinion as to Ravesloot's ability to perform sedentary work. Furthermore, employment opportunities for which Ravesloot is qualified and in which she would be physically able to perform do exist. Plaintiff argues that it is not clear that Dr. Reiser's clarifications were considered by Dr. Mahawar and/or in the vocational assessment. However, Dr. Reiser's clarifications were included in Ravesloot's file and were considered (as were all of Ravesloot's medical records) by the Appeals Specialist in making the decision to terminate benefits based on Ravesloot's no longer being "disabled" under the Plan. In addition, Ravesloot has not demonstrated that Dr. Reiser's clarifications would have changed the vocational assessment. Moreover, Dr. Reiser did not retract or amend his finding that Ravesloot could perform sedentary work after making his clarifications. Rather, Dr. Reiser, after making the clarifications, confirmed this finding in a telephone conversation with Dr. Mahawar, which he later acknowledged by signing a summary of the conversation prepared by Dr. Mahawar. Thus, his opinion that Ravesloot could work in a sedentary occupation remained the same regardless of these clarifications.

Given that Ravesloot no longer meets the requisite definition of having a "disability" and there exist employment opportunities in which she could perform, Hartford's decision to deny Ravesloot any further benefits was appropriate. Further, Hartford provided Ravesloot notice of its

16

decision and set forth its specific reasons for terminating benefits. Because there are no issues as to any material fact, Plaintiff's Motion for Summary Judgment is denied; and Defendants' Motion for Summary Judgment is granted.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is denied; and Defendants' Motion for Summary Judgment is granted.

Dated: *April 24, 2008*

JOHN W. DARRAH
United States District Court Judge

17